UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| TERRI VELLENOWETH, et al., | Case No. 22-cv-05779-AMO |
|---|---|
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF NAPA, et al., | |
| Defendants. | Re: Dkt. No. 53 |

This is a Section 1983 case arising from an officer-involved shooting. Defendants' motion for summary judgment was heard before this Court on November 7, 2024. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS** Defendants' motion in part and **DENIES** Defendants' motion in part, for the following reasons.

I.  **BACKGROUND**

Decedent Jeremy James Vellenoweth ("Jeremy") was 26 years old and lived with his parents. Plaintiffs Gary Vellenoweth ("Gary") and Terri Vellenoweth ("Terri") are Jeremy's parents.[1] Defendant Dominic Deguilio was a City of Napa police officer at the time of the events underlying this case; City of Napa is additionally named as a Defendant.

A.  **The Leadup**

On October 6, 2021, Plaintiffs arrived home from a trip and parked their truck in the driveway behind Jeremy's truck. Gary Dep. 76:18-23; Terri Dep. 74:24-75:2; Ring Video 8:50. Jeremy was standing outside his truck on the passenger side, drinking, and holding his shotgun.

---

[1] In light of the family members' shared last name, the Court follows the course set in the papers and mostly refers to Jeremy, Gary, and Terri using their first names to mitigate confusion.

Gary Dep. 76:24-77:6; Terri Dep. 75:22-76:2. Both parents exited the vehicle to talk to Jeremy, but when Terri told Jeremy to put away the shotgun he held, he did not respond. Terri Dep. 75:3-16. Terri then ran to stand on a neighbor's porch two houses away. Terri Dep. 76:3-25; Ring Video 9:01-9:25. Gary observed Jeremy was drunk, and when he told Jeremy to put the gun away, Jeremy refused. Gary Dep. 77:7-17, 80:6-15; Terri Dep. 77:8-20. In response to Gary's pleading with him to put the gun away in the house, Jeremy cried and screamed that no one was going to take his gun away. Terri Dep. 77:8-78:2.

During the interaction, Jeremy pointed the gun at Gary. Gary Dep. 77:18-22, 80:21-81:3, 81:13-14, 116:11-20; Ring Video 9:00-10:40. Gary quickly ran behind his truck to take cover. Gary Dep. 116:22-117:7. Gary then called 911 and reported that he needed help, his son was under the influence of alcohol, incoherent, and armed with a gun, and that Jeremy "wanted to go down by police." Gary Dep. 82:14-22, 117:8-16, 119:18-120:3. The dispatcher asked Gary if Jeremy wanted to commit "suicide by cop," and Gary responded, "yes." Gary Dep. 82:23-83:2. Gary told the dispatcher their location and said Jeremy was outside in front of the house. Gary Dep. 83:3-7. The Vellenoweths' neighbor also called 911 to report Jeremy pointed the shotgun at Gary. Gary Dep. 108:11-109:1, 110:3-11; 102:24-103:15. Gary and Terri continued trying to convince Jeremy to put the gun away. Gary Dep. 83:20-23.

**B.     The Incident**

Officer Deguilio was on duty when he heard dispatch advise that an individual was armed, intoxicated, pointing a weapon at his father, and "trying to commit suicide by police officer." Deguilio Dep. 72:4-10; *see also* Deguilio Dep. 175:2-13. According to reports from police dispatch, multiple people reported the subject was armed and repeatedly pointed a shotgun or rifle at his father. Deguilio Dep. 72:4-10, 76:13-21, 122:8-17; Toscani Dep. 36:8-16, 64:4-10; Koford Dep. 31:13-22. The suspect's parents reported that he had also been involved in a hit-and-run collision. Deguilio Dep. 219:9-220:20. Deguilio proceeded to Pear Tree Lane in response to the reports. Deguilio Dep. 68:10-19.

When Gary saw a responding police officer, he asked him to come help his son. Gary Dep. 83:20-84:16. Officer Nicholas Toscani, the first officer on the scene, was approaching the

2

1  house when he heard a gunshot. Toscani Dep. 42:5-18. He stepped back, drew his weapon and

2  radioed that a shot was fired, and he did not have a visual on anyone. Toscani Dep. 42:5-18,

3  86:22-24. Gary heard the gunshot and ran back to his residence to see Jeremy standing in the

4  driveway, still holding the shotgun. Gary Dep. 84:17-85:9; Ring Video 16:53-17:00. Terri also

5  heard the blast coming from the direction of her residence, and she yelled at Jeremy to put away

6  the shotgun. Terri Dep. 79:4-80:4, 84:7-9, 88:19-24.

7       Toscani heard yelling and heard Gary yell "drop the gun," and Toscani started approaching

8  the house through residential yards. Toscani Dep. 44:1-14, 45:17-22. He stopped behind a rock

9  fixture for safety. Toscani Dep. 46:13-22, 65:1-10.

10       When Deguilio arrived on scene, Officer Toscani was already there, but he did not see any

11  other officers on scene. Deguilio Dep. 68:25-69:3, 69:14-21, 70:9-16, 113:12-16. As Deguilio

12  was about to exit his vehicle, he heard Toscani broadcast over the radio, "Shots fired. I don't have

13  a visual yet." Deguilio Dep. 36:6-18, 72:14-18, 76:4-12, 101:10-13, 173:15-17, 202:25-203:7.

14  Deguilio also heard someone radio "Suspect's outside in front of the house" and "Dad's in front

15  yard." Deguilio Dep. 72:19-73:1, 203:8-204:1. Deguilio saw Gary and Terri in the street, but he

16  did not know the location of the shooter. Deguilio Dep. 37:9-11, 73:15-74:10. Deguilio could not

17  see Jeremy from the location where he stopped, but he saw Gary looking down the driveway,

18  indicating Jeremy's location. Deguilio Dep. 94:2-10, 231:18-21, 242:13-20.

19       Based on the information known to him at the time, Deguilio believed the situation

20  involved an active or potential shooter and he was concerned the shooter would continue shooting,

21  or that someone already was injured and needed medical attention. Deguilio Dep. 72:19-73:1,

22  80:20-83:4. Based on the information from dispatch, Deguilio knew multiple people had called

23  911 reporting that Jeremy had pointed a shotgun at Gary numerous times, and they feared for his

24  safety. Deguilio Dep. 72:4-18, 231:22-232:7, 233:6-10, 236:4-237:4. Deguilio exited his vehicle,

25  told Toscani he was going to move up, and ran towards the house where he believed the shooter

26  might be. Deguilio Dep. 40:24-41:6, 73:2-9, 74:16-22, 80:20-83:7, 113:17-114:9, 123:3-11,

27  153:4-18, 154:21-155:6, 233:6-234:25. Deguilio positioned himself behind a small tree for

28

1    protection, knelt down, and drew his firearm.  Deguilio Dep. 87:1-4, 94:11-24, 145:12-146:18,

2    224:15-226:14, 236:4-237:4, 242:13-20.

3          Mere seconds after Deguilio positioned himself behind the tree, Jeremy emerged from the

4    side of the house with the shotgun and walked forward towards Gary.  Deguilio Dep. 46:7-47:14,

5    143:7-22, 144:6-7, 224:21-226:14, 243:4-14, 244:10-17, 262:13-263:11; Toscani Dep. 48:11-25;

6    Ring Video 17:30-17:38.  Deguilio believed that Jeremy intended to use the shogun against him,

7    Gary, Terri, Toscani, or the neighbor, particularly given his behavior up to that point, including

8    pointing the gun at Gary and having already fired the shotgun.  Deguilio Dep. 46:10-24, 86:19-25,

9    223:12-224:20, 237:14-238:2.  Deguilio reportedly saw Jeremy move the shotgun in a sweeping

10   motion left to right, towards Deguilio's and Gary's locations – it appeared to Deguilio that Jeremy

11   held the shotgun up in a ready position, intending to acquire a target and possibly shoot one of

12   them.  Deguilio Dep. 46:7-47:24, 100:21-101:9, 107:1-108:6, 138:5-24, 143:7-22, 243:15-25;

13   Ring Video 17:30-17:38.  Deguilio yelled, "Put the gun down."  Deguilio Dep. 46:7-9, 48:10-12,

14   213:1-10; Deguilio Body Worn Camera ("BWC") 0.01-0.02.  From his vantage point, Toscani

15   also saw Jeremy had emerged with the shotgun extended and pointed out towards Gary and

16   Deguilio, and he heard Deguilio order him to drop the gun.  Toscani Dep. 48:11-25, 51:14-16.

17         Within moments of seeing Jeremy's movements, Deguilio fired his weapon.  Deguilio

18   Dep. 46:10-49:10, 49:21-50:5, 95:23-96:2, 138:5-24, 145:12-147:21, 152:16-153:3, 168:7-23;

19   Toscani Dep. 49:21-50:3, 51:17-21; Deguilio BWC 0.01-0.04; Ring Video 17:30-17:39.  Deguilio

20   stopped firing as soon as Jeremy disappeared from his sight.  Deguilio Dep. 97:10-16.  Deguilio

21   was approximately 30 yards from Jeremy, and Jeremy was 15 to 20 yards from Gary when

22   Deguilio fired his weapon.  Deguilio Dep. 85:8-13.  From Deguilio's position and vantage point in

23   front of Jeremy, Deguilio reportedly never saw Jeremy lower or move the shotgun downward

24   before he fired his weapon, and Deguilio believed they were all still within range of the weapon

25   held by Jeremy.  Deguilio Dep. 47:25-48:4, 153:19-154:5, 212:22-213:10, 237:5-13, 245:1-11; *see*

26   Deguilio BWC 0.01-0.08.  From Toscani's vantage point, he reported having a clear view of

27   Jeremy and saw him holding the shotgun at a 45-degree angle to the ground, and it appeared to

28

1  him Jeremy was moving the gun in an upward direction towards Gary and Deguilio at the time

2  Deguilio fired his weapon. Toscani Dep. 54:4-25, 55:11-15, 75:17-24.

3  Immediately after the shooting, Toscani radioed "Shots fired from us. Start medical."

4  Deguilio Dep. 204:7-9; Toscani Dep. 76:12-24. Jeremy was transported to the hospital. Gary

5  Dep. 100:24-101:1. Jeremy passed away 20 days later on October 26, 2021. Gary Dep. 107:9-12.

6  Less than one minute passed between the time Deguilio arrived on scene until the shooting.

7  Deguilio Dep. 75:20-76:3.

8  Gary and Terri brought this lawsuit on behalf of themselves and Jeremy's estate against

9  Officer Deguilio and the City of Napa. *See* Compl. (ECF 1). They bring the following federal

10  claims: (1) unreasonable seizure in violation of the Fourth Amendment to the United States

11  Constitution under Title 42 U.S.C. § 1983 and (2) violation of Plaintiffs' Fourteenth Amendment

12  Rights, including their right to familial relationship, also under Title 42 U.S.C. § 1983. In

13  addition, they bring claims under California state law for (3) wrongful death; (4) bystander

14  liability; and (5) survivorship. *See* First Am. Compl. (ECF 31).

15  **II.    DISCUSSION**

16  Defendants move for summary judgment regarding all of Plaintiffs' claims. *See* ECF 53.

17  Plaintiffs oppose.[2]

18  **A.    Legal Standard**

19  A party may move for summary judgment on a "claim or defense" or "part of . . . a claim

20  or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine

21  dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

---

[2] Plaintiffs filed a Motion for Nunc Pro Tunc Leave to Accept Filed Response in Opposition to Defendants' Motion for Summary Judgment, First Amended. ECF 60. The Court **GRANTS** Plaintiffs' motion as unopposed.

In addition, Plaintiffs filed a Motion to Strike significant portions of Defendants' Motion for Summary Judgment. ECF 56-24. Plaintiffs' Motion to Strike amounts to nothing more than objections to the evidence produced by Defendants in support of their Motion. Generally, to object to evidence at summary judgment, "[t]here is no need to make a separate motion to strike." Fed. R Civ. P. 56 advisory committee's note to 2010 amendment. Indeed, Civil Local Rule 7-3(a) provides clear guidance for opposition papers: "Any evidentiary and procedural objections to the motion must be contained within the brief or memorandum." The Court therefore **DENIES** Plaintiffs' Motion to Strike.

5

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). The asserted disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, when a non-moving party fails to produce evidence rebutting defendants' showing, then an order for summary adjudication is proper. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**B. Analysis**

The Court follows the structure presented in the parties' papers, proceeding to first analyze each of the constitutional claims, then Defendants' assertion of qualified immunity, and finally the state law claims.

**1. Fourth Amendment (Excessive Force)**

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S.

6

1, 9 (1968)). Under the Fourth Amendment, law enforcement officers may only use such force as is objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts analyze claims of excessive force under an "objective reasonableness" standard. *Id.* at 388. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and internal quotation marks omitted).

*Graham's* "proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). But these factors "are not exclusive. Rather, [courts] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.' " *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Courts also consider the " 'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citations omitted). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions,

7

1   and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary
2   judgment or judgment as a matter of law in excessive force cases should be granted sparingly."
3   *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citation
4   omitted).

5   The Ninth Circuit repeatedly has made clear that "when a suspect points a gun in an
6   officer's direction, 'the Constitution undoubtedly entitles the officer to respond with deadly
7   force.' " *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023), cert. denied, 144 S.
8   Ct. 559 (2024) (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)); *see also Scott v.
9   Henrich*, 39 F.3d 912, 914 (9th Cir. 1994). In *Strickland*, police responded to reports of a man
10  walking on a residential road with "what appeared to be a shotgun" slung over his shoulder, and
11  they found Strickland carrying a black, plastic airsoft rifle marked with an orange tip indicating it
12  was not a real firearm. After officers approached him, Strickland dropped to his knees and started
13  pointing the airsoft gun towards the officers and up towards the sky. *Id.*, 69 F.4th at 618. Seconds
14  later, Strickland lowered the barrel towards the officers and officers opened fire, striking
15  Strickland. *Id.* at 618. The Ninth Circuit reiterated that "[o]f all the use of force factors, the 'most
16  important is whether the suspect posed an 'immediate threat.'" *Id.* at 620. Accordingly, even
17  though the bulk of the *Graham* factors favored Strickland, the immediacy of the threat Strickland
18  posed outweighed those considerations and rendered the officers' belief that Strickland posed an
19  immediate threat objectively reasonable under the totality of circumstances. *Id.* at 620. When he
20  pointed the replica gun at the officers, "the officers were left with only an instant to act. They
21  were not required to 'delay their fire' until they learned whether the gun was real." *Id.* at 623.

22  In *Long v. City & Cnty. of Honolulu*, 511 F.3d 901 (9th Cir. 2007), police responded to
23  reports that Long fired several shots from a .22 caliber rifle, striking two people. Long barricaded
24  himself in his home and refused orders to surrender. *Id.* at 904. Throughout the night, Long
25  shouted threats at the police, threatened to shoot out their lights and fired a shot. *Id.* at 904-05. A
26  sharpshooter heard the report of shots fired at the officers, and upon seeing Long raise the rifle to
27  about chest level, the sharpshooter fired one shot striking Long in the chest. *Id.* at 904-05. In the
28  subsequent Section 1983 action, the Ninth Circuit found the officers' use of force was objectively

8

reasonable and did not violate Long's Fourth Amendment rights. *Id.* at 906. The court held that the use of deadly force was justified to address an immediate threat to officers, as "[i]t is enough that [the officer] heard the radio transmission and observed Long point the rifle in the officers' direction." *Id.* at 906-07.

Here, whether Jeremy posed an immediate threat to safety is the most significant issue. The parties heavily dispute that final and most important *Graham* factor. *See Smith*, 394 F.3d at 702. The parties present vastly different accounts of what took place in the seconds leading up to the shooting and how those events impacted the immediacy of the threat.

Defendants contend that Jeremy posed an immediate threat to which Deguilio responded based on the totality of circumstances. Defendants argue that Deguilio was responding to reports that Jeremy was extremely intoxicated and had been involved in a hit and run incident, and multiple reports that Jeremy was armed with a shotgun or rifle, outside and uncontained in a residential neighborhood. As in *Long*, police on scene heard a shotgun being fired, and Deguilio heard the radio broadcast that a shot was fired and Jeremy's location was unknown. *See Long*, 511 F.3d at 904-05. The officers did not know where the shot came from or if anyone had been shot. Deguilio Dep. 234:5-8. Indeed, Deguilio heard Toscani broadcast over the radio, "Shots fired. I don't have a visual yet." Deguilio Dep. 36:6-18, 72:14-18, 76:4-12, 101:10-13, 173:15-17, 202:25-203:7. Based on the information from dispatch, Deguilio knew multiple people had called 911 reporting that Jeremy had pointed a shotgun at Gary, and they feared for his safety. Deguilio Dep. 72:4-18, 231:22-232:7, 233:6-10, 236:4-237:4.

With this backdrop of reporting, Jeremy emerged from the side of the house and walked forward towards Gary, armed with a shotgun that Deguilio saw held up in a ready position across his chest with his right hand on the trigger guard, and his left hand on the forearm of the weapon such that it could be readily fired at Plaintiffs, their neighbor, Toscani, or Deguilio. Deguilio Dep. 46:7-47:14, 143:7-22, 144:6-7, 224:21-226:14, 243:4-14, 244:10-17, 262:13-263:11; Toscani Dep. 48:11-25; Ring Video 17:30-17:38. Jeremy had walked out past the house towards Gary's location in the street, and Deguilio yelled "Put the gun down." Deguilio Dep. 46:7-9, 48:10-12, 213:1-10; Ex. 8 0.01-0.02. From his vantage point, Toscani also saw Jeremy had emerged with

1  the shotgun extended and pointed out towards Gary and Deguilio, and he heard Deguilio order
2  him to drop the gun.  Toscani Dep. 48:11-25, 51:14-16.  Deguilio saw Jeremy move the shotgun in
3  a sweeping motion left to right, towards Deguilio and Gary's locations, and it appeared to
4  Deguilio that Jeremy was intending to acquire a target and possibly shoot.  Deguilio Dep. 46:7-
5  47:24, 100:21-101:9, 107:1-108:6, 138:5-24, 143:7-22, 243:15-25; Ring Video 17:30-17:38.
6  Within a fraction of a second of seeing Jeremy's sweeping movement with the shotgun up in a
7  firing position, Deguilio fired his weapon at Jeremy.  Deguilio Dep. 46:10-49:10, 49:21-50:5,
8  95:23-96:2, 138:5-24, 145:12-147:21, 152:16-153:3, 168:7-23; Toscani Dep. 49:21-50:3, 51:17-
9  21; Ex. 8 0.01- 0.04; Ring Video 17:30-17:39.  Based on this narrative, Deguilio's conduct
10 appears to be objectively reasonable because Jeremy posed an immediate threat – a threat to which
11 Deguilio was not required to delay in using force.
12         Conversely, Plaintiffs contend that Jeremy did not pose an immediate threat at the time he
13 was shot.  They assert that Jeremy was unaware of Officer DeGuilio's presence or that of any
14 other police officers, as they had not identified themselves upon arrival or when ordering Jeremy
15 to drop his weapon.  Deguilio testified that he did not identify himself as a police officer before
16 shooting the Jeremy, stating in response to a deposition question, "No. There was no time for
17 that."  Deguilio Dep. 94:25, 95:1-2.  Video from a neighbor's Ring video camera angled at the
18 Vellenoweth home from across the street shows that, rather than aiming the shotgun as Defendants
19 aver, Jeremy was merely holding the shotgun when he walked down his on driveway.  Ring Video
20 17:30-17:39.  Plaintiffs posit that Jeremy was not allowed sufficient time to respond to the order to
21 lower his weapon.  The Ring Camera recording of the incident was played for Officer Deguilio
22 where a shotgun blast was heard.  Pori Decl., Ex. 11, Ring Garage Video at 16:53; Deguilio Dep.
23 at 210:16-21.  The Ring video establishes the timeframe from when Officer Deguilio yelled, "Get
24 out of the street," at 17:36 into the video, until the shots were fired at 17:39.  Pori Decl., Ex. 11, at
25 17:36-39.  When asked whether he saw the gun go down before he started shooting, Deguilio
26 replied, "That's what the video depicts, but that's not what I could see from my vantage point."
27 Deguilio Dep. at 212:17-25.
28

Deguilio's body camera footage was also played back for him during deposition. Deguilio Dep. at 213:25, 214:1-8. The Axon video shows the camera turning on as Deguilio takes a position behind a small tree. Pori Decl., Ex. 8 at 00:00. One second into the video, Jeremy can be seen walking out of the driveway holding the shotgun, pointed to Jeremy's left but not at Deguilio or his father, who is to Deguilio's left and out of view of the body worn camera. *Id.* at 00:01. Two seconds into the video, Deguilio orders Jeremy to "Put the gun down." *Id.* As Plaintiffs reasonably view the evidence, Jeremy lowers the weapon within one second of the order, but Deguilio immediately begins shooting at him while the shotgun is pointed down. *Id.* at 00:02.

Based on this video evidence, some of which is difficult to discern, reasonable minds can disagree about what Jeremy was doing in the moments before he was shot, whether he was aiming the shotgun at any other person, and whether he was lowering the weapon in response to police commands. In particular, Deguilio testified that he saw the Jeremy sweeping the gun as if to take aim, while the video footage suggests that Jeremy was lowering the weapon from a raised position in the second prior to being shot. Given the contradicting evidence, especially given Deguilio's concession that the Ring video depicted something different from what he saw from his vantage point, the Court cannot find as a matter of law that Jeremy posed an immediate threat that rendered Defendants' use of force objectively reasonable. Because there is a material dispute of fact as to the direction of the weapon before and after Deguilio shot Jeremy, and thus a dispute regarding the immediacy of the threat posed, summary judgment cannot be granted. Therefore, the Court **DENIES** Defendants' motion for summary judgment as to the Fourth Amendment cause of action.

### 2. Fourteenth Amendment (Interference with Familial Relation)

The Fourteenth Amendment states in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[A] parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child and . . . a child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). In order to show a violation of the right to familial association under the Fourteenth Amendment's due process clause, a plaintiff must establish that

an officer's use of force "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

"There are two tests used to decide whether officers' conduct 'shocks the conscience.' " *Ochoa*, 26 F.4th at 1056. Determining "[w]hich test applies turns on whether the officers had time to deliberate their conduct." *Id.* at 1056. The "deliberate indifference" standard applies "if the situation at issue 'evolve[d] in a time frame that permits the officer to deliberate before acting.' " *Id.* (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical[.]" *Lewis*, 523 U.S. at 851-53.

Plaintiffs here concede that a different test applies to situations like the one at issue, situations "that escalate so quickly that the officer must make a snap judgment." *Porter*, 546 F.3d at 1137; *see also* Pl.s' Opp. at 17. In cases requiring snap judgment, the "purpose to harm" standard applies. That standard requires a plaintiff to make "a more demanding showing that [an officer] acted with a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137 (emphasis in original) (citing *Lewis*, 523 U.S. at 836). "For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even,' " *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citation omitted), "or when an officer uses force against a clearly harmless or subdued suspect," *Ochoa*, 26 F.4th at 1056 (quotation marks and citations omitted). The Ninth Circuit has explained that "when an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply." *Id.* at 1139.

Here, Plaintiffs argue that Deguilio's conduct meets the "purpose to harm" standard based on the ways in which Deguilio departed from Napa Police Department policies, including by circumventing the Department's critical incident response plans in several respects. *See* Pl.s' Opp. at 17. But none of the cited conduct or internal policy violations rise to the high level of purpose to harm, which is akin to force that "is meant only to 'teach him a lesson' or to 'get even'" or even "an officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer intended to harm, terrorize or kill." *Porter*, 546 F.3d at 1140-41. Plaintiffs proffer no

1  evidence to show that Deguilio used his firearm for some purpose unrelated to the legitimate
2  object of defending himself and others.
3       To the extent that Plaintiffs argue that Deguilio used excessive force against Jeremy by
4  shooting him seven additional times after the first shot rendered him "helpless," this argument
5  fails.  Plaintiffs cite no law nor point to any record evidence suggesting that Jeremy was rendered
6  harmless following the first shot.
7       In sum, on this factual record, Plaintiffs fail to present any evidence or otherwise create a
8  triable issue on Defendants' purpose to harm.  Therefore, the Court **GRANTS** Defendants' motion
9  for summary judgment as to the Fourteenth Amendment claim.

### 3.     **Qualified Immunity**

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Waid v. Cnty. Of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An officer is entitled to qualified immunity unless the plaintiff shows that (1) the officer violated the plaintiff's constitutional right and (2) the right was clearly established at the time of the incident." *Martinez v. High*, 91 F.4th 1022, 1028 (9th Cir. 2024) (internal quotations and citation omitted).  The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The Ninth Circuit has held repeatedly that "summary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997) (citation omitted).

As discussed above, disputes of fact remain regarding the Fourth Amendment claim, such that a grant of qualified immunity would be premature at this stage.  How a jury resolves the relevant factual disputes will determine whether constitutional rights were violated and whether the Court must proceed to the clearly established prong of the analysis.  The Court declines to reach whether the right to be free from excessive force was clearly established until the trier of

fact first assesses the objective reasonableness of Deguilio's conduct, including the immediacy of the threat posed by Jeremy at the time he was shot.

For the Fourteenth Amendment claim, the Court need not analyze whether the right to familial association was clearly established because Plaintiffs have not shown a violation of constitutional rights based on the facts of this case given their failure to carry their to "purpose to harm" burden.

Therefore, the Court denies qualified immunity for the Fourth Amendment claim and denies it as moot for the Fourteenth Amendment claim.

### 4. State Law Claims

Plaintiffs assert state law claims for (3) wrongful death – negligence, (4) negligent infliction of emotional distress, and (5) survivorship – negligence on their own behalf and on Jeremy's behalf. Defendants argue that they are entitled to summary judgment on all of these negligence-based claims because Deguilio owed no legal duty where his conduct was objectively reasonable. For the same reasons discussed above, there exists a material dispute of fact as to whether Jeremy posed an immediate threat at the time he was shot, a material dispute that precludes finding that Deguilio's conduct was objectively reasonable. *See Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 632 (2013) ("the reasonableness of a peace officer's conduct must be determined in light of the totality of circumstances"). Accordingly, for the same reasons, the Court **DENIES** summary judgment as to these state law causes of action.

Finally, Defendants argue that they are statutorily immune against the state law claims. Government Code § 812.2 reads in relevant part, "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Government Code § 820.2 immunizes public employees from liability for "an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused," while § 820.8 provides that "a public employee is not liable for an injury caused by the act or omission of another person."

1   Here, Defendants provide two conclusory statements and zero analysis regarding how
2   these immunities may be implicated in this case.  Mot. at 25.  The Court finds that Defendants fail
3   to carry their burden to show that the immunities apply to the facts of this case.  Therefore, the
4   Court **DENIES** summary judgment on the state law claims on the basis of state law immunities.

**III.  CONCLUSION**

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: February 10, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

15